UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                     :

CIMONTUBO – TUBAGENS E SOLDADURA
LDA,                                                    :

        Plaintiff,                    :    REPORT AND RECOMMENDATION

  -v.-                                     :    20 Civ. 5382 (GBD) (GWG)

PETRÓLEOS DE VENEZUELA, S.A. and    :
PDVSA PETRÓLEO, S.A.,
                                                    :

        Defendants.
-------------------------------------------------------------x

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      Plaintiff Cimontubo – Tubagens E Soldadura, LDA ("Cimontubo") filed this lawsuit against Petróleos De Venezuela, S.A. ("PDVSA") and PDVSA Petróleo, S.A. ("Petróleo") alleging that defendants defaulted on a promissory note. On March 4, 2021, the District Court granted Cimontubo's summary judgment motion, see Docket # 37 ("SJ Decision"), and referred the matter to the undersigned to address the issue of attorneys' fees, costs, and interest. The parties agree as to the amount of attorney's fees and costs incurred through February 28, 2021, and the rate of post-judgment interest but dispute the calculation of pre-judgment interest.[1] For the following reasons, the defendants' arguments as to pre-judgment interest should prevail and plaintiff should be awarded a judgment of $45,424,081.20, as of April 2, 2021, with additional

---

[1] See Declaration of Stuart Riback in Support of Calculation of Damages, filed April 2, 2021 (Docket # 48) ("Riback Decl."); Plaintiff's Memorandum of Law Regarding Calculation of Amount of Judgment, filed April 2, 2021 (Docket # 49) ("Pl. Mem."); Notice of Stipulation, filed April 2, 2021 (Docket # 50); Letter from Scott Watnik, filed April 5, 2021 (Docket # 52); Letter from Stuart Riback, filed April 9, 2021 (Docket # 55) ("Riback Let."); Memorandum of Law in Opposition to Plaintiff's Calculation of Amount of Judgment, filed April 12, 2021 (Docket # 56) ("Def. Mem."); Declaration of Matthew Ducharme in Opposition, filed April 12, 2021 (Docket # 57) ("Ducharme Decl."); Plaintiff's Reply Memorandum of Law Regarding Calculation of Amount of Judgment, filed April 20, 2021 (Docket # 58) ("Pl. Reply").

pre-judgment interest accruing each day in the amount of $8,919.02, until the date judgment is entered. Cimontubo should also be awarded $119,818.00 in attorney's fees and $4,715.35 in costs.

I. FACTS

A. Procedural History

Cimontubo, a Portuguese company, sued defendants, two Venezuelan companies, in New York state court for defaulting on a Note that provided for the repayment of a loan. SJ Decision at 1. Cimontubo was the Initial Noteholder, PDVSA was the Issuer, and Petróleo was the Guarantor. Id. at 2. PDVSA made only the first four interest payments required by the Note and none of the principal payments or subsequent interest payments. SJ Decision at 4. Cimontubo sent a default notice to the defendants on November 7, 2019, and as a result an "Event of Default" occurred on November 12, 2019, as defined in the Note Agreement. Id. at 4. Several more Events of Default occurred after that. Id. at 4-5.

Cimontubo filed suit in New York state court on June 11, 2020. Id. at 5. The case was removed to this court and the district court eventually granted summary judgment to Cimontubo. In the decision, Cimontubo was awarded $40,133,417.27, the amount Cimontubo claimed it was owed as of June 1, 2020, along with "attorneys' fees, costs, pre-judgment and post-judgment interest against Defendants." Id. at 11. The district court referred this case to the undersigned to determine "attorneys' fees, costs, and interest." Id. The parties have since stipulated to the attorneys' fees and costs owed as of February 28, 2021, consisting of $119,818.00 for attorney's fees and $4,715.35 for costs. See Notice of Stipulation, filed April 2, 2021 (Docket # 50), at 1. They dispute only the calculation of interest.

B. The Note and the Note Agreement

The Note provides as follows

FOR VALUE RECEIVED, the undersigned, PETRÓLEOS DE VENEZUELA, S.A. . . . hereby promises to pay to CIMONTUBO - TUBAGENS E SOLDADURA, LDA. . . . the principal sum of THIRTY-FIVE MILLION SEVEN HUNDRED TWENTY THOUSAND SIX HUNDRED THIRTY-ONE and 43/1OO$^{th}$ DOLLARS ($35,720,631.43), with interest (a) on the unpaid principal balance thereof based on and computed on the basis of the actual number of days elapsed on a year of 365 days, at a rate per annum equal to six and one-half percent (6.50%), payable quarterly, on March 22, 2017 (the "Initial Repayment Date") and on each day in March, June, September and December described on Exhibit A hereto occurring after the Initial Repayment Date on or prior to December 22, 2019 . . . and (b) on any overdue payment of principal, any overdue payment of interest, payable quarterly as aforesaid (or, at the option of the registered holder hereof, on demand), at a rate per annum of eight and one-half percent (8.50%) per annum, calculated as set forth above. The principal amount of this Note shall be due and payable on each Repayment Date . . . with each installment being equal to the amounts set forth on Exhibit A hereto, with any unpaid principal and interest on this Note not previously paid being due and payable in full on the Maturity Date.

Notice of Removal, Exh. A, Note at 1-2. The Note attaches an exhibit setting forth the schedule on which PDVSA was to repay its loan, and the corresponding interest due on each date, calculated at a 6.5% annual rate. See id. at 4. That schedule appears as follows:

Exhibit A
To
6.50% SENIOR GUARANTEED NOTE, SERIES 2016S

| Repayment Date | Principal Amount Due | Interest Due |
|---|---|---|
| March 22, 2017 | $0 | $572,508.75 |
| June 22, 2017 | $0 | $585,231.17 |
| September 22, 2017 | $0 | $585,231.17 |
| December 22, 2017 | $0 | $578,869.96 |
| March 22, 2018 | $4,465,078.93 | $572,508.75 |
| June 22, 2018 | $4,465,078.93 | $512,077.27 |
| September 22, 2018 | $4,465,078.93 | $438,923.38 |
| December 22, 2018 | $4,465,078.93 | $361,793.72 |
| March 22, 2019 | $4,465,078.93 | $286,254.38 |
| June 22, 2019 | $4,465,078.93 | $219,461.69 |
| September 22, 2019 | $4,465,078.93 | $146,307.79 |
| December 22, 2019 | $4,465,078.92 | $72,358.74 |

3

The Note recites that it has been issued "pursuant to the Note Agreement dated as of December 22, 2016." Id. at 2. The Note Agreement states that the Note Agreement, along with "other Finance Documents constitute the entire contract between the parties relative to the subject matter hereof." Notice of Removal, Exh. B, Note Agreement § 9.10. It defines "Finance Documents" as "this Agreement, the Notes, and any other document executed in connection with the foregoing." Id. § 1.01.

In a section entitled "Default Interest," section 2.04, the Note Agreement provides:

> **Section 2.04 Default Interest.** If (a) the Issuer shall default in the payment of any principal of or interest on any Note or any other amount due hereunder or under any other Finance Document, by acceleration or otherwise (including automatic acceleration), or (b) if any Event of Default under Article VII (other than paragraph (a), (b) or (f) of Article VII) has occurred and is continuing and the Required Noteholders accelerate the Notes or direct the Administrative Agent to accelerate the Notes, then, in the case of clause (a) above, until such defaulted amount shall have been paid in full or, in the case of clause (b) above, from the date the applicable action has been taken by the Required Noteholders and for so long as such Event of Default is continuing or until the date the Required Noteholders agree otherwise, to the extent permitted by law, all amounts outstanding under this Agreement and the other Finance Documents shall bear interest (after as well as before judgment), payable on demand, based on and computed on the basis of actual number of days elapsed on a year of 365 days, at a rate per annum equal to eight and one half percent (8.50%).

The Note Agreement also contains a section, Article VII, entitled "Events of Default." One such Event of Default is a failure to pay any amount of principal when written notice has been given and after five days has elapsed. See Note Agreement at 32. The Note Agreement states that if any such event occurs, the note holders may declare the "notes then outstanding to be forthwith due and payable in whole or in part." Id. at 33. If such a declaration is made, "the principal of the Notes so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Issuer accrued hereunder and under any other Finance Document, shall become forthwith due and payable." Id.

II. LEGAL STANDARD

Both the Note and Note Agreement are governed by New York law.  See Note at 2; Note Agreement § 9.07.  Under New York law, "a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed." Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978) (punctuation omitted).  "A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous . . . nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992) (punctuation omitted).  "[A] court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." Laba v. Carey, 29 N.Y.2d 302, 308 (1971) (punctuation omitted).  But if there is an irreconcilable "inconsistency between a specific provision and a general provision of a contract . . . the specific provision controls." Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (1956); accord TBA Glob., LLC v. Fidus Partners, LLC, 132 A.D.3d 195, 204 (1st Dep't 2015).

"An agreement is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." Ellington v. EMI Music, Inc., 24 N.Y.3d 239, 244 (2014) (punctuation omitted).  But "[a]mbiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent . . . or when specific language is susceptible of two reasonable interpretations." Id. (punctuation omitted).  Under such circumstances, a court "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir.

5

1998). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction." McCostis v. Home Ins. Co. of Indiana, 31 F.3d 110, 113 (2d Cir. 1994). Here, the parties have offered no extrinsic evidence as to the meaning of the provisions.

III. DISCUSSION

The Court first observes that plaintiff's arguments essentially seek reconsideration of the portion of the district court's order that awarded damages to Cimontubo. The summary judgment decision awarded Cimontubo $40,133,417.27, at its request, see Notice of Removal, Exh. A, Notice of Motion at 2, and referred the matter to determine only attorneys' fees, costs, and "pre-judgment and post-judgment interest against Defendants." SJ Opinion at 11. But rather than argue for what pre-judgment interest should be assessed against the $40,133,417.27 awarded in damages by the summary judgment decision, Cimontubo now implicitly argues that the $40,133,417.27 figure was wrong, and that in fact it is owed more under the Note than it previously sought.[2] But inasmuch as defendant has not objected to these arguments as improper,

---

[2] In Cimontubo's motion for summary judgment in lieu of complaint, Cimontubo's Managing Partner, Antonio Pereira, contended that the amount plaintiff was entitled to as of June 1, 2020 was "$38,330,317.15 (consisting of $35,720.631.43 in principal plus $2,609.685.72 in ordinary interest) . . . as well as $1,803,100.12 in default interest thereon as of June 1, 2020," totaling $40,133,417.27. See Notice of Removal, Exh. A, Affidavit of Antonio Pereira, dated June 11, 2020, ¶ 13. In other words, Cimontubo originally sought (1) the remaining principal payments due under the Note (totaling $38,330,317.15); (2) the remaining unpaid interest payments listed in the Note — i.e., interest that was calculated on principal at the 6.5% rate (totaling $2,609.685.72); and (3) $1,803,100.12 in default interest, which derived from applying the 8.5% rate to sum of (1) and (2) as of the November 12, 2019, Event of Default through June 11, 2020. If Cimontubo had used the same formula in the instant motion that it had used when it sought summary judgment, Cimontubo would be seeking $42,855,919.94 as of April 2, 2021 ($38,330,317.15 in principal plus $2,609.685.72 in scheduled interest payments plus $4,525,602.79 in interest on these two amount at the 8.5% rate through April 2, 2021). Instead, Cimontubo now argues it is owed far more: $46,207,325.15 in principal and interest as of April 2, 2021. Riback Decl. ¶ 10.

6

and indeed has set forth its own revised damages calculation, see generally Ducharme Decl., we address the parties' arguments.

The parties agree that, at some point, the entire unpaid principal of the Note — $35,720,631.43 — began to accumulate interest at the annual 8.5% rate set forth in the Note Agreement and the Note. See Pl. Mem. at 3; Def. Mem. at 3. The parties further agree that post-judgment interest in this action is 8.5% annually, as that rate is mandated by section 2.04 of the Note Agreement. Pl. Mem. at 3-4; Ducharme Decl. ¶ 10. The only difference between the parties' calculations centers on what date the 8.5% rate, as opposed to the initial 6.5% rate, began to apply to the calculation of interest on the principal that had not yet been paid under the Note's repayment schedule. Cimontubo asserts that the 8.5% rate began to apply to the entirety of the unpaid principal — regardless of when the principal was scheduled to be paid under the Note — as soon as defendants missed their first payment, which was a payment of principal and interest due on March 22, 2018. Pl. Mem. at 3. Defendants contend that the 8.5% rate applied only to a principal payment that was unpaid on the date it was scheduled to be paid. Defendants assert that the 8.5% rate kicked in as to all unpaid payments only after the Event of Default, which occurred on November 12, 2019, see SJ Decision at 4, because at that point all the remaining unpaid principal became "outstanding and start[ed] accumulating interest at 8.5%" as was permitted by § 2.04(b) of the Note Agreement, Def. Mem. at 3. Cimontubo's proposed calculation results in defendants' owing $46,207,325.15 as of April 2, 2021, Riback Decl. ¶ 10, with an additional $9,072.21 accumulating each day, Riback Let. at 1. Defendants' proposed calculation results in $45,424,081.20 owed as of April 2, 2021, with an additional $8,919.02 accumulating each day. Ducharme Decl. ¶¶ 9-10. Both parties argue that the Note and Note Agreement unambiguously provide for the result they seek.

Cimontubo argues that the plain language of the Note Agreement's § 2.04 "mandates that as soon as PDVSA missed the March 22, 2018 payment, all amounts due thereafter were to be based upon an interest rate of 8.5% instead of the indicated 6.5% rate." Pl. Mem. at 3. It points to § 2.04's language that "[i]f (a) the Issuer shall default in the payment of any principal of or interest on any Note . . . then, in the case of clause (a) above, until such defaulted amount shall have been paid in full . . . <u>all amounts outstanding</u> under this Agreement and the other Finance Documents shall bear interest (after as well as before judgment) . . . based on and computed on the basis of actual number of days elapsed on a year of 365 days, at a rate per annum equal to eight and one half percent (8.50%)." Note Agreement § 2.04 (emphasis added). In other words, Cimontubo equates section 2.04's reference to "all amounts outstanding" to mean, as it puts it, "all amounts due thereafter." Pl. Mem. at 3.

The question thus becomes: in the case of a single missed payment, and where there had as yet been no "Event of Default," did the parties intend the term "outstanding" to mean all remaining payments that were due under the payment schedule? Or did the parties intend the term "outstanding" to mean any payment whose payment due date had actually been missed?

After carefully examining the Note and the Note Agreement, we believe that where one payment for a scheduled date had been missed, the parties intended that the term "all amounts outstanding" refer only to any payments due whose scheduled payment dates had been missed. This is because where a first payment of principal is missed, the Note and the Note Agreement do not suggest that the debtor owes anything other than the missed payment that is actually due, unless some acceleration of payment otherwise occurs. The remaining payments are not due until future dates specified on the schedule. Without some provision that accelerates the due

dates of those payments, those payments cannot be characterized as "outstanding." As a result, we reject the notion that the word "outstanding" refers to payments due in the future.

Certainly, as plaintiff points out, there is "no rational business reason to continue a credit at a low rate after the debtor fails to make a payment." Pl. Reply at 2. But this does not mean that the phrase "outstanding" can appropriately bear the weight of this business expectation. In fact, the contract contained a provision for accelerating the due date of all remaining scheduled payments in Article VII, entitled "Events of Default." Article VII specifically permits acceleration of payments as long as notice is given and a five-day cure period has elapsed. See Note Agreement at 32. In this case, plaintiff eventually made use of the "Event of Default" provision to accelerate the amounts due. But it did not do so for more than a year-and-a-half. Defendants agree that, once the Event of Default occurred in November 13, 2019, the 8.50% rate kicked in as to all remaining payments. Def. Mem. at 3.

Whatever ambiguity might be said to inhere in the term "outstanding" in section 2.04 of the Note Agreement is certainly eliminated by the wording of the Note itself. The Note makes clear that the parties intended the 8.50% interest rate to apply only to "overdue payment[s] of principal" and interest. Note at 2 (emphasis added). In light of the clear schedule as to payments, and before the Event of Default with its concomitant acceleration, the only "overdue" payment as of March 2018 was the missed principal and interest payment, not the remaining principal or interest payments on the schedule since none of these future payments were then "overdue."

Cimontubo asks that we ignore the Note and focus only on section 2.04 of the Note Agreement. See Pl. Reply at 2 ("No matter what the Note may provide with respect to increasing the interest rate on all amounts once there was a nonpayment of any amount, that does

9

not override the provisions of the Note Agreement."); accord id. at 3 (arguing that the Note Agreement is "the negotiated contract between the parties," while the Note is simply "part of the ***implementation*** of the Note Agreement") (emphasis in original).  As we have already stated, however, we do not read section 2.04 to favor plaintiff's interpretation.  But in any event, we reject the notion that the Note is somehow less important than the Note Agreement on the ground that the Note is merely an effort to "implement[]" the Note Agreement.  Id. at 3.  The Note Agreement states that "[t]his Agreement and the other Finance Documents constitute the entire contract between the parties relative to the subject matter hereof."  Note Agreement § 9.10.  The Note Agreement further defines "Finance Documents" as "this Agreement, the Notes and any other document executed in connection with the foregoing."  Id. § 1.01.  Thus, the Note makes up part of the contract itself, and its terms must be considered in conjunction with the terms of the Note Agreement.  See Nat'l Conversion Corp. v. Cedar Bldg. Corp., 23 N.Y.2d 621, 625 (1969) ("All parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency.").

    Cimontubo also argues that the Note's language is irrelevant to determining the extent of defendants' liability because "PDVSA's obligations under the Note Agreement and Note are not coterminous." Pl. Reply at 2.  The Court agrees that the Note Agreement contains additional obligations that go beyond those contained in the Note — for instance, as Cimontubo points out, "Cimontubo's expenses and attorneys' fees are amounts due under the Note Agreement but not under the Note." Id.  But this example does not support the conclusion Cimontubo wants the Court to draw: namely, that the Note's text can be ignored if it could be viewed as conflicting with the Note Agreement.  Rather, the example suggests that where the Note makes no mention of a term contained within the Note Agreement, the Note Agreement controls.  Thus, there is no

conflict between the text of the Note and the text of the Note Agreement on the issue of fees and expenses given that the Note does not mention that issue. But the Note explicitly mentions the 8.5% rate and limits the applicability of that rate to "overdue" payments. See Note at 2.

In concluding that defendants' interpretation must prevail, the Court does not opine on whether there is a "rational business reason" for this financial arrangement, Pl. Reply at 2, or whether it accords with common business practices, because the Court finds the agreement between the parties unambiguous. See Ellington, 24 N.Y.3d at 244 ("Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.").

IV. CONCLUSION

For the foregoing reasons, judgment should be against the defendants in the amount of $45,424,081.20, plus an amount representing prejudgment interest to be calculated by the Clerk at the rate of $8,919.02 per day starting on April 3, 2021, through the date judgment is entered. Also, Cimontubo should be awarded $119,818.00 in attorney's fees and $4,715.35 in costs. Post-judgment interest should accrue at the rate of $8,919.02 per day.

**PROCEDURE FOR FILING OBJECTIONS TO THIS**
**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to Judge Daniels. If a party fails to file timely

objections, that party <u>will not be permitted to raise any objections to this Report and Recommendation on appeal</u>.  See <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 17, 2021June 17, 2021
      New York, NY

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge